**Ruth MARX (Widow of Robert Marx), Petitioner,**

v.

**DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR, BENEFITS REVIEW BOARD, Respondents.**

**No. 88–3407.**

United States Court of Appeals, Third Circuit.

Argued Dec. 16, 1988.

Decided March 13, 1989.

Linus E. Fenicle (Argued), Tive, Hetrick and Pierce, P.C., Harrisburg, Pa., for petitioner.

Michael Denney, Roscoe C. Bryant, III (Argued), United States Dept. of Labor, Washington, D.C., for respondents.

Before GIBBONS and
HUTCHINSON, Circuit Judges, and
BROTMAN, District Judge *.

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

Ruth Marx, the widow of Robert Marx (Marx), petitions for review of a decision and order of the Benefits Review Board (Board). The Board's order affirmed a decision of an Administrative Law Judge (ALJ) denying Marx's claim for benefits and Mrs. Marx's claim for survivor's benefits under the Black Lung Benefits Act, 30 U.S.C.A. §§ 901–945 (West 1986) (the Act). The ALJ determined Mrs. Marx was not entitled to the statutory presumption that her husband died from pneumoconiosis and had not otherwise established her right to survivor's benefits. He also denied Marx's claim, concluding that Mrs. Marx had not shown her husband was totally disabled from pneumoconiosis prior to his death.

We have jurisdiction pursuant to 30 U.S.C.A. § 932(a), which incorporates the review procedures of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C.A. § 921(c) (West 1986). We conclude that the ALJ did not adequately explain his reasons for denying Mrs. Marx the benefits of the presumption and that this error was not harmless. We also hold that the ALJ incorrectly evaluated Marx's claim. Accordingly, we will vacate the Board's order and remand for further proceedings.

## I.

Marx filed for benefits under the Act on July 7, 1980. He died on January 11, 1981 and his widow informed the Director of this fact on February 23, 1981 by submitting a "Survivor's Notification of Beneficiary's Death." The Director then administratively denied both the original claim and Mrs. Marx's request for survivor's benefits.

Mrs. Marx sought a hearing. She attempted to show that she was entitled to survivor's benefits because her husband died of pneumoconiosis. See 20 C.F.R. § 718.1(a) (1988). She relied on the rebuttable presumption, available on claims filed before January 1, 1982, that one who had worked at least ten years in the mines and died of a respirable disease died of pneumoconiosis. 30 U.S.C.A. §§ 921(c)(2), 940; 20 C.F.R. § 718.303 (1988).[1] As evidence that Marx met the durational requirement, his brother Alvin testified that Marx worked in independent mines from 1943 until entering military service in 1951. Alvin's testimony that this included work for James Frank was supported by Frank's written statement that he worked with Marx in the mines from 1945 until 1951. Mrs. Marx then testified that her husband worked in the mines from his discharge in May, 1953 until 1957. She indicated that while Marx had other employment during this period, he continued to work regularly in the mines:

> Well, he was working at Alcoa, like part time, he'd be working like maybe two weeks, then he'd be layed [sic] off then

---

* Hon. Stanley S. Brotman, Judge of the United States District Court for the District of New Jersey, sitting by designation.

1. 30 U.S.C.A. § 921(c)(2) provides:

   If a deceased miner was employed for ten years or more in one or more coal mines and died from a respirable disease there shall be a rebuttable presumption that his death was due to pneumoconiosis. The provisions of this paragraph shall not apply with respect to claims filed on or after the effective date of the Black Lung Benefits Amendments of 1981.

   20 C.F.R. § 718.303, which implements this statutory language, reads:

   (a) If a deceased miner was employed for ten or more years in one or more coal mines and died from a respirable disease, there shall

be a rebuttable presumption that his or her death was due to pneumoconiosis.

   (1) Under this presumption, death shall be found due to a respirable disease in any case in which the evidence establishes that death was due to multiple causes, including a respirable disease, and it is not medically feasible to distinguish which disease caused death or the extent to which the respirable disease contributed to the cause of death.

   (b) The presumption of paragraph (a) of this section may be rebutted by a showing that the deceased miner did not have pneumoconiosis, that his death was not due to pneumoconiosis or that pneumoconiosis did not contribute to his or her death.

   (c) This section is not applicable to any claim filed on or after January 1, 1982.

he'd go in the mines. Then he'd be called back to Alcoa, then he'd go back to Alcoa for maybe a couple of weeks, then back into the mines.

Transcript of June 24, 1986 hearing (Transcript) at 12–13.[2]

The Director relied solely on documentary evidence to refute this testimony. In his initial application, Marx stated he had worked in independent mines from 1944 until 1953 and for Chornack Brothers, a mining company, from 1953 to 1954. He listed no work as a miner after 1954. The Director also introduced Marx's Social Security records from 1945 through 1955. These show earnings from Alvin Young, a mining concern, in the third quarter of 1945 and from Chornack Brothers from the third quarter of 1953 through the fourth quarter of 1954. The records further reveal earnings from General Battery Corporation in the second quarter of 1955, and from Alcoa in the second, third, and fourth quarters of 1955. Director's Exhibit 6.

There was also evidence that Marx died of a respirable disease. His treating physician, Dr. William Walters, reported that in 1972 Marx had "all the clinical signs and symptoms of pulmonary emphysema, bilaterally. He had a barrel-shaped chest ... and [his] breath sounds were very distant, bilaterally, and he had fine, wheezing rales on inspiration and expiration." Appendix (App.) at 21. A pulmonary function test administered when Marx was hospitalized in March, 1980 showed moderate airflow obstruction and Dr. Walters concluded that Marx "had chronic obstructive pulmonary disease of long duration, evidently, due to anthracosilicosis." Id.[3] Hospital records from June, 1980 state that Marx had pulmonary emphysema, id. at 22, a diagnosis consistent with Dr. Walters's finding, and a blood gas study administered during Marx's final hospitalization in January, 1981 produced values establishing total disability under the regulations. Id. at 27; 20 C.F.R. § 718.204(c)(2) & Appendix C (1988). The January, 1981 hospital records indicate a history of tuberculosis, pulmonary infiltrate, probable pneumonia, post-obstructive, and hypernephroma of the kidney and state that "[t]he cause of death was thought to be respiratory arrest or acute respiratory failure secondary to pulmonary metastases, from hypernephroma of the kidney in addition to bacterial pneumonia." App. at 28.[4]

The ALJ found that the evidence showed at most eight years of coal mine employment, rendering the presumption of death due to pneumoconiosis inapplicable. He then considered the medical evidence. The ALJ denied Marx's claim, finding that although Marx was totally disabled prior to his death he did not suffer from pneumoconiosis. The ALJ also denied the claim for survivor's benefits since Mrs. Marx had "failed to establish causation between any disability her husband had on [sic] the cause of his death." App. at 38.

The Board affirmed, rejecting Mrs. Marx's attacks on the ALJ's findings regarding pneumoconiosis and causation. The Board therefore found no "need to discuss claimant's remaining arguments since establishing causation presumptively by showing twelve years of coal mine employment or by competent evidence would not negate the fact that the claimant failed to establish the existence of pneumoconiosis, an essential element of entitlement." Id. at 43. In a footnote, the Board stated that since the survivor's claim was filed after January 1, 1982, the presumption of

---

**2.** Where possible, we will cite to the Appendix provided by the petitioner. Occasionally, however, it will be necessary to cite to portions of the Administrative Record which are not in the Appendix.

**3.** Under the regulations, pneumoconiosis is defined to include anthracosilicosis. 20 C.F.R. § 718.201 (1988).

**4.** This same evidence was offered in support of Marx's claim, which requires a showing of total disability from pneumoconiosis which arose at least in part out of coal mine employment. See 20 C.F.R. §§ 718.1(a), 718.203(a) (1988); McClendon v. Drummond Coal Co., 861 F.2d 1512, 1514 (11th Cir.1988) (per curiam) (under 20 C.F.R. § 718.203(a), claimant must show miner's condition arose "at least in part" from coal mine employment).

death due to pneumoconiosis was inapplicable. *Id.* at 43 n. 2.[5]

## II.

An ALJ's findings of fact are conclusive on the Board if supported by substantial evidence. *Oravitz v. Director, Office of Workers' Compensation Programs, United States Dep't of Labor* [party hereinafter designated "Director, OWCP"], 843 F.2d 738, 739 (3d Cir.1988). We review the Board's decision to determine whether it committed an error of law and whether it adhered to its scope of review. *Id.* In performing the latter function, "we must independently review the record 'and decide whether the ALJ's findings are supported by substantial evidence.'" *Kertesz v. Crescent Hills Coal Co.,* 788 F.2d 158, 163 (3d Cir.1986) (quoting *Walker v. Universal Terminal & Stevedoring Corp.,* 645 F.2d 170, 172 (3d Cir.1981) (citation omitted)).

■ We consider first Mrs. Marx's claim for survivor's benefits. The Director concedes the Board erred in stating the rebuttable presumption could not be invoked because the survivor's claim was filed after January 1, 1982. Under 20 C.F.R. § 725.305(b) (1988), a writing indicating an intent to claim benefits is considered a claim if a formal application is filed within six months after it is requested by the Department of Labor. Mrs. Marx submitted such a writing on February 23, 1981 when she filed a "Survivor's Notification of Beneficiary's Death." While the record does not reveal when the department requested a formal application, the Director admits that the claim form filed on July 6, 1982 complied with the six month timetable. Brief for Respondent at 2 n. 1. The claim was therefore filed as of February 23, 1981 and the Board committed legal error in holding that the presumption could not be invoked upon a proper showing.

■ If, however, the ALJ's finding that Marx worked at most eight years in the mines is supported by substantial evidence, the presumption was still unavailable. In so determining, the ALJ stated:

The miner's brother, Joseph Marx, testified that the miner began working in coal mine employment in 1943 for independent bootleg mines, and that he continued to work for bootleg mines steadily until 1951. He then stated that the miner went into the service in 1951 where he stayed until 1953. The Claimant testified that her husband went back into the mines in 1953 and continued to work as a miner until 1957. I find this testimony to be entitled to only modest credit due to several considerations. Some of it was vague, self[-]serving, and in conflict with the Social Security records reporting wages from non-coal mine sources during this period. While it is plausible that bootleg operators did not always report wages, the fact that some wages are documented for this period tends to suggest knowledge of Social Security tax implications to the miner so that he would have wanted to insure this coverage for all his employment. Thus, I cannot forego the inference with the lack of coverage conveyed from the lack of entries on the Social Security records. On the basis of the testimony presented, therefore, I find that the miner worked in coal mine employment for 8 years as the maximum duration I can find.

App. at 36.[6]

On the basis of this statement, we cannot tell what evidence the ALJ credited and why. The Social Security records show mine employment for one quarter in 1945 and six quarters in 1953–54. Therefore, the eight years the ALJ found Marx worked in the mines had to include six and a quarter years for which no Social Security records were introduced. The ALJ did

---

**5.** It is evident that the statement about petitioner's failure to establish pneumoconiosis relates only to Marx's lifetime claim. The rebuttable presumption which Mrs. Marx attempted to invoke on the survivor's claim shows the existence of pneumoconiosis as well as causation.

**6.** In citing the testimony of Marx's brother, the ALJ was apparently referring to Alvin Marx rather than Joseph Marx. Mrs. Marx testified that her husband worked in the coal mines until 1957, the year his brother Joseph died in the mines. Although Marx's son is also named Joseph, he did not appear at the hearing.

not explain whether this six and a quarter years of work occurred solely during the 1943–51 period, or some in that period and some between 1955 and 1957. We are also unable to determine which is the case from the ALJ's reasoning that the documentation of some wages suggests Marx would wish to insure Social Security coverage of all his employment. Marx had covered wages both before and after his military service and the ALJ's rationale could undermine the testimony Mrs. Marx presented about her husband's mine work during each period.[7]

Even assuming that the ALJ only discounted the testimony of mine work after 1954—since Marx's Social Security records were far more extensive after his military service—it is still not clear on what basis he found six and a quarter years of mine work during 1943–51. Alvin Marx testified that his brother worked as a miner throughout this period. He provided little information on Marx's employment in individual years and the ALJ did not explicitly rely on such details to support his finding. Similarly, we cannot tell if the ALJ utilized James Frank's statement that Marx worked in the mines between 1945 and 1951, since the decision makes no mention of this evidence.[8]

An ALJ's opinion should clearly set forth his factual findings and legal conclusions. *Jasinskas v. Bethlehem Steel Corp.*, 735 F.2d 1, 3–4 (1st Cir.1984); *Director, OWCP v. Rowe*, 710 F.2d 251, 254–55 (6th Cir. 1983); *see also Hillibush v. United States Dep't of Labor, Benefits Review Bd.*, 853 F.2d 197, 206 & n. 17 (3d Cir.1988) (ALJ's opinion subject to Administrative Procedure Act requirement of "a statement of reasons accompanying all material findings of fact"). Here, we do not know how the ALJ determined that Marx worked no more than eight years in the mines. His resolution of this issue therefore falls short of the requisite standard and precludes effective review. *Jasinskas*, 735 F.2d at 5; *Schaaf v. Matthews*, 574 F.2d 157, 160 (3d Cir.1978); *see also Director, OWCP v. United States Steel Corp.*, 606 F.2d 53, 55–56 (3d Cir.1979) (where ALJ failed to make sufficient findings on attorney's fees, Board exceeded its statutory scope of review by reversing the ALJ and ordering payment of fee rather than remanding); *Kane v. Matthews*, 583 F.2d 878, 881 (3d Cir.1978) (court may not affirm by resolving factual issue not decided by ALJ).

■ The Director, however, argues that any error by the ALJ in determining Marx's coal mine employment is harmless. Relying on *Tackett v. Benefits Review Bd.*, 806 F.2d 640 (6th Cir.1986) and *Hunter v. Director, OWCP*, 803 F.2d 800 (4th Cir. 1986), he maintains that a claimant must show that the respirable disease suggests a reasonable possibility that death was due to pneumoconiosis. Since, the Director continues, the record "establishes beyond any doubt that the miner died due to pneumonia as a result of cancer of the kidney," Brief for Respondent at 18, Mrs. Marx would not have been entitled to the rebuttable presumption of death due to pneumoconiosis even if she had met the durational requirement.

*Tackett* and *Hunter* interpreted 20 C.F. R. § 410.462, which provides:

7. If the ALJ only discounted the testimony of mine employment for periods when other work was shown by the Social Security records, the basis for his finding is likewise unclear. Mrs. Marx stated that her husband continued to work regularly in the mines during his period ·of employment with Alcoa, explaining that when he was laid off by Alcoa he would return to the mines. The ALJ did not specifically find that Marx's earnings at Alcoa were too extensive to preclude this possibility. Moreover, the Director only introduced Social Security records for the years 1943 through 1955. Thus, there was no evidence as to where Marx worked in 1956 and 1957 other than Mrs. Marx's testimony that he worked in the mines.

8. Both Marx's initial application and the survivor's claim list employment in the mines from 1945 through 1954. At oral argument, the Director theorized that the ALJ may have deducted from this ten-year period two years for Marx's military service to arrive at eight years of mine employment. The ALJ, however, did not offer this as a basis for his decision. Similarly, the ALJ did not rely on the Director's stipulation at the administrative hearing that Marx had eight years of coal mine employment. Transcript at 31, 33.

(a) Even though the existence of pneumoconiosis as defined in § 410.110(*o*)(1) is not established as provided in § 410.454(a), if a deceased miner was employed for 10 years or more in the Nation's coal mines and died from a respirable disease, it will be presumed, in the absence of evidence to the contrary, that his death was due to pneumoconiosis arising out of employment in a coal mine.

(b) Death will be found due to a respirable disease when death is medically ascribed to a chronic dust disease, or to another chronic disease of the lung. Death will not be found due to a respirable disease where the disease reported does not suggest a reasonable possibility that death was due to pneumoconiosis. Where the evidence establishes that a deceased miner suffered from pneumoconiosis or a respirable disease and death may have been due to multiple causes, death will be found due to pneumoconiosis if it is not medically feasible to distinguish which disease caused death or specifically how much each disease contributed to causing death.

20 C.F.R. § 410.462 (1986). The United States Court of Appeals for the Sixth Circuit stated that this regulatory scheme indicates "that it is part of the definition of respirable disease that it suggests such reasonable possibility [of death due to pneumoconiosis]," and permitted the claimant to make such a showing on remand. *Tackett*, 806 F.2d at 641 n. 3, 642. Similarly, the United States Court of Appeals for the Fourth Circuit read the second sentence of subsection (b) as requiring the claimant to present evidence that the disease reported suggests a reasonable possibility of death due to pneumoconiosis. *Hunter*, 803 F.2d at 804.

Here, we deal not with § 410.462 but with 20 C.F.R. § 718.303. Both provide a rebuttable presumption of death due to pneumoconiosis where a miner was employed for at least ten years in the mines and died of a respirable disease. Section 718.303, however, does not contain a provision similar to the limitation found in the second sentence of § 410.462(b) upon which the *Tackett* and *Hunter* courts relied. *See supra* n. 1. This difference is a strong indication that in a case governed by § 718.303 the claimant need not show that the disease reported suggests a reasonable possibility of death due to pneumoconiosis. *See Director, OWCP v. Mangifest*, 826 F.2d 1318, 1326 (3d Cir.1987) (omission in one section of exclusionary language found in three other sections "suggests a consciously different policy").

The Director does not openly acknowledge this distinction between the two regulations. Instead, he asserts that the reasoning in *Tackett* and *Hunter* is persuasive because the Secretary's comments on the adoption of § 718.303 show that claims under this provision are to be treated in the same manner as those arising under § 410.462. When § 718.303 was promulgated, the Secretary stated:

> The Department has considered and accepts the comments urging that the regulation not exclude lung cancer and diseases of bacteriological or viral origin as links to pneumoconiosis. Since it is possible that a relationship between these diseases and exposure to coal mine dust and death may be established by medical evidence in a particular case, the exclusion of these conditions from those which may trigger the presumption is inappropriate.

45 Fed.Reg. 13,692 (Feb. 29, 1980). This comment is ambiguous. The last sentence may mean, as the Director urges, that the claimant must show the necessary relationship by medical evidence in order to invoke the presumption. On the other hand, it may also be read as allowing the presumption to be utilized when any respirable disease is shown, in accordance with the plain language of the regulation. Under this view, the burden would be on the Director to rebut the presumption by demonstrating through medical evidence the absence of any relationship between the disease and pneumoconiosis.[9]

---

9. We note that as originally proposed § 718.303 contained the following subsection (c):

> Where death was not caused or significantly hastened by a respiratory disease arising in

We need not decide whether the explicit limitation in § 410.462 may fairly be read into § 718.303. Assuming that the Director's construction of the regulations is correct, we must remand because the record contains sufficient evidence to permit a finding that Marx died of a respirable disease. Marx suffered from emphysema and Dr. Walters opined that he had "chronic obstructive pulmonary disease of long duration." App. at 21. A pulmonary function test showed moderate airflow obstruction and an arterial blood gas study produced values indicating total disability. The death certificate lists pneumonia as a cause of death and it is at least possible that Marx's existing respiratory impairments contributed to this cause of death. In this regard, we note that the presumption applies if death was "due to multiple causes, including a respirable disease, and it is not medically feasible to distinguish which disease caused death or the extent to which the respirable disease contributed to the cause of death." 20 C.F.R. § 718.303(a)(1). Because we cannot hold the evidence of a respirable disease inadequate as a matter of law, its sufficiency is for the ALJ to determine in the first instance.[10]

There is an additional reason to remand. The Secretary has noted that diseases of bacteriological or viral origin, such as pneumonia, an acknowledged cause of Marx's death, may be linked to pneumoconiosis by medical evidence. Before *Hunter* and *Tackett*, ALJs and the Board had "treated the 'reasonable possibility' language of the second sentence of § 410.462(b) as part of the Director's rebuttal case." *Hunter*, 803 F.2d at 803. Both of these cases were decided after the administrative hearing in this case. Since it is far less clear that the requirement is even applicable to claims governed by § 718.303, it would be unfair to hold that Mrs. Marx's failure to introduce such evidence could be fatal to her cause when her conduct comported with prior administrative practice under § 410.462. While we do not now decide whether the Director's construction of § 718.303 is proper, on remand Mrs. Marx should at least have the opportunity to introduce evidence which satisfies that standard.

### III.

Finally, we turn to whether Marx was entitled to benefits because he was totally disabled from pneumoconiosis prior to his

whole or in part out of dust exposure in the miner's coal mine employment (e.g., lung cancer or a bacteriological or viral disease) and there is no evidence indicative of the existence of pneumoconiosis, *the presumption shall be considered rebutted.*

43 Fed.Reg. 17,726 (Apr. 25, 1978) (emphasis added). The highlighted language indicates that, contrary to the Director's assertion, the proposed regulation did not exclude certain respiratory diseases from those which could invoke the presumption. Rather, it contemplated that the presumption would apply to such diseases. The presumption would then be rebutted if there was *no* evidence indicating pneumoconiosis.

In rejecting this version of subsection (c), the Secretary conceded he was taking a more liberal approach than the one advanced in the proposed regulations. Similarly, § 718.303 as promulgated is more favorable to claimants on the particular point at issue than § 410.426. If the Secretary had intended that §§ 718.303 and 410.426 have the same meaning, he could have found a clearer way of expressing his intent than through the language quoted by the Director. *See Bethlehem Steel Corp. v. Occupational Safety and Health Review Comm'n*, 573 F.2d 157, 161 (3d Cir.1978) (Secretary is respon-

sible for promulgating clear regulations; the "test is not what he might possibly have intended, but what he said"), quoted in *Mangifest*, 826 F.2d at 1324. While a "reasoned interpretation of a regulation's language" by the Director, the Secretary's delegate, is entitled to deference, this does not empower the Director to read non-existent language into a regulation. *Mangifest*, 826 F.2d at 1324. Similarly, we do not defer to an agency's view which is not connected to the language of a regulation. *Id.*

10. The Director notes that the hospital records indicate the cause of death to be "respiratory arrest or acute respiratory failure secondary to pulmonary metastases, from hypernephroma of the kidney in addition to bacterial pneumonia." App. at 28. He argues that this shows Marx died from cancer of the kidney which transferred to the lungs. Brief for Respondent at 18. This is not, however, the only possible reading of the hospital records. Since respiratory failure or respiratory arrest was apparently the immediate cause of death, Marx's preexisting respiratory impairments may have been a contributing factor to his demise. In addition, we note that the hospital records state only that the above ailments were *thought* to be the cause of death. *Id.*

death. The ALJ denied the claim, determining that while Marx was totally disabled he did not suffer from pneumoconiosis. He found Dr. Walters's diagnosis that Marx had the disease was not entitled to substantial weight. Although noting that Dr. Walters based his conclusion on a physical examination and a pulmonary function test, the ALJ stated there was "no indication from the doctor as to how he made the diagnosis." App. at 37. The ALJ then discounted the reference to the pulmonary function test, observing that "[t]he impaired pulmonary function with the existence of metastasis from the tumor site tends to refute the lung involvement as being mine related." *Id.* He proceeded to surmise that the hospital records' reference to pulmonary emphysema were a function of Marx's smoking history and that smoking was also the likely explanation for the findings of a barrel-shaped chest. *Id.* at 38.

Mrs. Marx argues that since Dr. Walters's report describes the findings from a physical examination, the ALJ erred in stating there was no indication of how the diagnosis of pneumoconiosis was made. The Director does not take issue with this contention. Instead, he argues that Dr. Walters failed to consider the extent of Marx's smoking history. The Director maintains that the report is therefore not a reasoned one and that the ALJ properly

discredited it. *See* 20 C.F.R. § 718.202(a)(4) (1988) (physician's finding of pneumoconiosis "shall be supported by a reasoned medical opinion").

The Director's analysis has two flaws. First, it presumes that Dr. Walters did not know the extent of Marx's smoking history. The ALJ made no finding on this question. Moreover, Dr. Walters's report specifically noted that Marx smoked. While the report did not provide details on this point, the ALJ could have found that, as Marx's treating physician, Dr. Walters was aware of the extent of Marx's smoking. Second, the ALJ did not discredit the report for the reason advanced by the Director. Regardless of whether he may have done so, we may not assume that he would have followed the Director's reasoning.[11] Accordingly, we must remand Marx's claim so that the ALJ may properly consider whether Dr. Walters's report constitutes substantial evidence that Marx suffered from pneumoconiosis.[12]

## IV.

For the reasons set forth above, we will vacate the order of the Board and remand for further proceedings consistent with this opinion.

11. In discussing Marx's smoking history, the ALJ stated:

> While the VA records refer to pulmonary emphysema as a tertiary diagnostic impression, this is more a function of the smoking history of twenty-five pack years, or as reported in the terminal VA stay in 1981 "He was a 90 pack/year smoker." The abnormal physical examination findings relative to barred [sic] chest are understood more in the context of the smoking history than coal mine exposure.

App. at 38. Both the Board and the Director agree that in these statements "the ALJ improperly set his medical expertise against that of the physician in finding the physician's physical examination findings related to the miner's smoking." Brief for Respondent at 13; *Gober v. Matthews,* 574 F.2d 772, 777 (3d Cir.1978).

12. The Director argues that there is insufficient evidence to support a finding that Marx's disability was due to pneumoconiosis, another element of Marx's case. The Director notes that the blood gas study which established total disability does not alone show causation, 20 C.F.R. § 205(c)(5) (1988), and asserts that there is no evidence of the etiology of Marx's impairments. Brief for Respondent at 13 n. 7. Dr. Walters, however, attributed Marx's "chronic, obstructive pulmonary disease" to anthracosilicosis. App. at 21. If credited, Dr. Walters's report permits a finding that the disability was due to pneumoconiosis.

Benefits would be due on Marx's claim only if the ALJ also finds that Marx's pneumoconiosis arose at least in part out of his employment in the mines. If the ALJ determines that Marx had at least ten years coal mine employment, the rebuttable presumption that pneumoconiosis arose out of such employment would come into play. 20 C.F.R. § 718.203(b) (1988). We also note that since the survivor's claim was filed before January 1, 1982, if Marx was entitled to benefits at the time of his death Mrs. Marx would be entitled to survivor's benefits. 20 C.F.R. § 718.1(1988).